# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------)
SECURITIES AND EXCHANGE COMMISSION  )
                      Plaintiff          )
     VS.                                     )      Case: 1:19-cv-12557
                                     )
SONGJIANG WANG (A/KA SAM WANG)    )      ANSWER TO COMPLAINT
                 Defendant   pro se  )
----------------------------------------------------------------)

Defendant, Songjiang Wang, hereby files this answer to the complaint from Plaintiff, Security and Exchange Commission("SEC") as bellows:

## Summary

Plaintiff doesn't perform its due diligence on this case. All of the statements made by Plaintiff in the Complaint either are misstated about the time period in relates to material nonpublic information(MNPI), or used/referred to the imprecise time points regarding MNPI, or/and continue to use information even though that has already been verified in court as false by both the testimonies and evidences during Wang's criminal trial. It seems Plaintiff inherited the same tactics as what the prosecutor did by fabricating scenarios about tipping and trading against Defendant in this civil case.

Defendant reserves its rights to request dismissal of the complaint on any and all grounds. The court should deny Plaintiff's complaint against Songjiang Wang("Wang"),

1) on the imposed scenario of tipping his close friend Schultz Chan("Chan") with highly confidential information about the clinical trial of Wang's employer Merrimack Pharmaceuticals, Inc. ;

2) on the imposed scenario of receiving tips, the MNPI, from Chan to trade the stocks of Chan's employer Akebia Therapeutics, Inc.;
3) on the so-called illegal profit of $108,000.

## Term of insider trading

Insider trading is the buying or selling of a publicly traded company's stock by someone who has nonpublic information about that stock. Information is material if there is a substantial likelihood that it will affect a company's stock price once released. Insider trading can be legal or illegal depending on when the insider makes the trade and what information insider has. It is illegal if someone trade a stock and possess the information which is material and nonpublic. It is legal if insider was not in possession of material nonpublic information when trade stock(s), i.e. the information insider possessed is not material and insider can't take advantage of the information to trade stock(s). Legal insider trading happens often, such as when a CEO buys back company shares, or when employees buy stock in the company where they work.

Therefore, the timing of the trade is crucial to affirm if the insider trading legal or illegal. If trading happened after the MNPI was in possession and before the MNPI was released, then the conduct of stock trading is illegal; if trading happened before the MNPI was in possession or after MNPI was released, then the conduct of stock trading is legal.

## Statement of the truth of FACTS

As described above, those three (Time of trading, MNPI, and time when MNPI being possessed) are the key factors to determine if the insider trading is legal or illegal. In the complaint, Plaintiff doesn't provide any evidences or references to prove the facts of MNPI or prove the time period when MNPI that Defendant possessed. Plaintiff played words game to mislead this court by blurring the time period regarding when MNPI occurred/started existing and about what exactly the time period when Defendant possessed the MNPI, such as they use words like "evaluating the results", "being conducted as to the efficacy of company's drug candidates", but without providing to this court with any specific time periods, Plaintiff just simply tried to

confuse this court that Defendant's possession of MNPI at all times of a clinical trial. In clinical trials, evaluating efficacy results happens at the end of the trials after all data are completely collected and cleaned. A clinical trial can last years to complete. Plaintiff uses what is described in the defendant's general job responsibilities, such as "evaluating results" to complain against Defendant possessing the MNPI at all time of this clinical trial, therefore performing illegal insider trading.

Both the timing of stocks being successfully traded and the timing of MNPI being possessed must be synchronized in order to judge whether inside trading is legal or illegal. The time of stock trades is typically recorded to a time point like date, hour, minute and even second. However, Plaintiff exaggeratedly uses very broad time span, such as "month", "about a month", "late year", or "early year" when they try to cap the Defendant into more broad time periods, even multiple time periods of MNPI being possessed by Defendant so that they can mislead the court by using the enlarged possessing period of MNPI to deliberately frame Defendant's specific trades as illegal. Plaintiff use its such fabricated MNPI "at all time" to measure the times of Defendant's stock trades, then allege Defendant made illegal insider trading at any time points during the fabricated time period of MNPI.

Without providing contents of phone calls and text messages, Plaintiff uses timestamps of phone calls and text messages between Wang and Chan to allege Wang and Chan tipping each other. As plaintiff described in this case, "Wang and Chan were close friends who regularly talked by phone, exchanged text messages...". Without giving contents, plaintiff just simply used the recorded time stamps of phone calls and texting to make their speculation to a tipping schema. Without contents, Plaintiff selectively as their will picked the phone calls or text messages according to timestamps help them set up a schema of tipping to match the manually enlarged window of the possession of MNPI, even though the text messages they picked were just about normal greetings. This is obviously not the truth of the facts. As will explain below, before those phone calls and text messages, Wang and Chan already had been trading those stocks or already gained companies' information via public information from their own research.


The Memorandum and Order from Judge Talwani filed on 10/24/2018 page 21 states "It does appear that the government's evidence presented at trial varied somewhat from the indictment". "A variance occurs when the facts proved at trial differ from those alleged in the indictment." United States v. Cruz-Arroyo, 461 F.3d 69,77(1st Cir. 2006). Plaintiff disregards the truth of the facts and deliberately cast so called facts to complain against Defendant for making illegal insider trading.

# Answer to the facts Plaintiff listed

Plaintiff's complaint paragraph:

*"14. At all relevant times, Wang and Chan were close friends who regularly talked by phone, exchanged text messages, and saw each other in person. During the work week, they often met for lunch, as they both worked in Cambridge, Massachusetts, within walking distance of each other."*

Answer:

The statement at the above is not correct. During FBI interview, what Defendant said was that he talked to Chan mostly via telephone, including text messaging. The truth is not like what Plaintiff has exaggerated as 'regularly talked by phone, exchanged text message' with which they intend to hint the court that Wang and Chan talked and exchange information always at all relevant times.

Plaintiff's complaint of paragraph:

*"15. During the course of their friendship, Wang provided sizable cash loans to Chan. In or around March 2015, Chan repaid Wang some or all those loans".*

Answer:

Chan repaid Wang all those loans with interest. This was confirmed during Chan's testimony. Plaintiff twists the facts and intentionally keep 'some ... loans' to give court an imagination on profit transferring.

Plaintiff's complaint of paragraph:

*"16. At all relevant times, Merrimack was a biopharmaceutical company focused on development of drug candidates for the treatment of various types of cancers. Before a biopharmaceutical company like Merrimack can release a new drug, it must conduct clinical trials to determine whether the drug is effective in providing treatment to patients and safe."*

Answer:

The above statement is vague and very unprofessional and tend to mislead. Merrimack is a biopharmaceutical company at all times. But determining a drug effective or not is usually conducted at the end of clinical trial, not 'at all relevant times'. Plaintiff purposely play shallow word games by blurring the time periods to hint this court that the determination of a drug's effectiveness can be conducted at all relevant times in order to cap Defendant into any trades they want to complain.

Plaintiff's complaint of paragraph:

*"17. Beginning in December 2011, Wang worked as Director of Statistical Programming at Merrimack. In that role, Wang was responsible for, among other things, evaluating the results of clinical trials by conducting statistical analyses."*

Answer:

"Evaluating the result of clinical trials" is one of Wang's general job responsibilities, but this doesn't entitle Wang having the capability to do the evaluating "at all times". The effectiveness of a drug in trial can only be evaluated at the END of a clinical trial, not during the course of a trial.

In addition, Plaintiff referenced Wang's job start date when he joined Merrimack on December 2011. Plaintiff uses this date of December 2011 to count as the beginning of Wang's "evaluating the results". Again, the Plaintiff intended to mislead the court to believe that Wang evaluated the results of clinical trials and possessed MNPI since the beginning in December 2011.

Just a correction: When Wang joined Merrimack on December 2011, he worked as Sr. Manager, not as a Director.

----------

Plaintiff's complaint of paragraph:

*"18. As Merrimack's employee, Wang owed a duty or trust or confidence to Merrimack and its shareholders. Wang was also subject to Merrimack's insider trading policy, which prohibited employees from trading the company's securities while in possession of material nonpublic information and from disclosing material nonpublic information to others."*

Answer:

As Merrimack employee, Wang hold the duty, trust, and confidence to Merrimack. Wang strictly followed Merrimack's insider trading policy. Wang's trading of Merrimack stocks was all traded outside company's blackout periods and traded while not in possession of material nonpublic information. Even after Merrimack's General Counsel sent an email to a very small group of eight people, including Wang, and said in the email to these eight people: "We are currently in an open trade widow", Wang still went in to meet General Counsel and got confirmed with General Counsel that Wang could currently trade Merrimack's stock at the open trade window.


Plaintiff's complaint of paragraph:

*"19. As a result of his position at Merrimack, Wang had access to a restricted database that collected data about clinical trials being conducted as to the efficacy of the company's drug candidates."*

Answer:

Like any organizations, different function groups in Merrimack have different restrictions to access their function directories or databases. In clinical trial, in order to avoid any bias, drug treatments are usually blinded before database is transferred to pharmaceutical company from third party (typically a CRO). Merrimack did so for its phase III clinical trial. This clinical trial is an open label study by design, but in order to avoid bias, the treatment values are blinded to Merrimack staffs by replacing the real treatment values with fake values. As an example, only the doctors and patients know which drugs they are truly taking in the hospital/clinics, but when the data comes to the Merrimack and saved into the restricted directory, treatments values are disarranged, meaning a patient who actually received treatment drug could randomly be labeled as having received one of the comparators/placebo or vice versa. As a result, when anyone in Merrimack to look at the database, it couldn't tell any meaningful results about the drug. Also, efficacy analysis is normally conducted at the end of a clinical trial and after database is unblinded. According to the Statistical Analysis Plan of the study, it says 'There is no statistical analysis of the data prior database locked for primary analysis." Wang's direct manager Bruce Belanger testified in Wang's criminal trial and confirmed that he "didn't have any idea" on whether the clinical trial was successful or not before the data was unblinded even he had the access to the restrict database. Plaintiff obviously twists the facts here. It uses "restrict database" "being conducted as to the efficacy" without any time frame to hint and misled the court that Wang possessed MNPI at all time during the clinical trial.

Plaintiff's complaint of paragraph:

*"20. Notwithstanding his duty to Merrimack and its shareholders, Wang tipped Chan with material nonpublic information about Merrimack's clinical trial results in advance of the company announcing positive drug trial results on at least three separate occasions in late 2013 and early 2014. Chan used his information to trade in Merrimack securities for a profit."*

Answer:

Disregarding the MNPI possessed and the accurate time period of MNPI possessed, Plaintiff uses the general duty to allege Wang tipping Chan to trade Merrimack securities for a profit. In the document of blackout period provided by government, it is clearly listed on which periods of time, which group of people were blackout for trading. In Plaintiff's statement, it exaggerated the three time points of three

occasions into long period of 'late 2013 and early 2014' in which Plaintiff can use this long time period to include the specific short period of MNPI Wang possessed, then accuse Wang tipped Chan during the long period. During Wang's criminal trial, it is confirmed that those occasions are not true. Wang was neither involved in the clinical trials nor possessing the MNPI in two of the three occasions Plaintiff stated. Judge Talwani in her Order and Memorandum says, "government's evidence presented at trial varied somewhat from the indictment." Merrimack counsel Jeff Munsie in his email on 11/26/2013 verified that Wang didn't possess any MNPI around that time. Again, Plaintiff doesn't provide any details to support its complaint or provide false information to make its malicious allegation in this case.

Plaintiff's complaint of paragraph:

*"21. For example, in or about April 2014, Wang tipped Chan about the positive drug trial results for MM-398, one of Merrimack's drug candidates at that time, to trade in advance of the company's positive announcement about MM-398's drug trial results on May 1, 2014."*

Answer:

"in or about April 2014" is another cunning trick that Plaintiff used by throwing out a vague and wide-open time span to trap Defendant into the tipping schema; "in or about April 2014" can cover any day of the 30 day period in April 2014. The statement they made at 21. did not mention the exact DATE when Wang gained the positive drug results. The try to play the same technique here by creating a theory that Wang could "evaluate at all times" so that he knew the positive drug trial results during April 2014. .

Plaintiff's complaint of paragraph:

*"22. Wang received access to confidential drug trial results for MM-398 on or about the morning of Saturday, April 19, 2014."*

*"23. At 9:30 a.m. on Monday, April 21, 2014, Chan placed an order to purchase 32,522 shares of Merrimack stock."*

*"24. At 9:44 a.m. that morning, Merrimack's General Counsel sent Wang and other employees who had received the drug trial results an email reminding them of their obligations not to share the drug trial results."*

Answer:

This is the very first time that Plaintiff provided specific MNPI and the accurate time point when MNPI occurs. It is the truth that Wang received the confidential drug trial data on April 19, 2014, then gained the trial results (MNPI) based on the data received. The data got

unblinded the very first time during the entire course of trial. At any time point before this date April 19, 2014, Wang did not process any MNPI.

From government's summary on Chan's TD Ameritrade account, it clearly shows that Chan was trying to buy 32,522 shares of Merrimack stock since April 17, 2014 which was prior to Wang gaining the MNPI about drug trial results. It was that Chan's buy order did not get filled successfully on April 17, 2014.

On April 21, 2014, record showed that Chan entered a buy order of same amount of 32,522 shares of Merrimack stock. This was more of a continuing action of fulfilling his April 17's buy order.

Plaintiff had no evidence to prove any communication exchanged between Wang and Chan during the time period from April 19, 2014 through April 21, 2014. How Chan's trade of 32,522 shares Merrimack stocks is related to Wang?

### Plaintiff's complaint of paragraph:

*"25. On the afternoon of the following Friday, April 25, 2014, Wang and Chan had four telephone calls. Late the next morning, on Saturday, April 26, 2014, they had two phone calls. Early that afternoon, Wang received a draft of a Merrimack press release discussing the final drug trial results for MM-398. On the morning of Sunday, April 27, 2014, Wang and Chan had six phone calls."*

*"26. At 11:51 a.m. on Monday, April 28, 2014, Chan purchased 5,740 shares of Merrimack stock." "27. Chan purchased Merrimack stock between April 21 and April 28, 2014, while aware of, and on the basis of, material nonpublic information about the MM-398 drug trial that he had received from Wang."*

Answer:

In Plaintiff's statements, they simply list a series of telephone call record but never provided any contents that prove those calls related to Chan's trading. The list doesn't provide any evidence that Wang passed any MNPI information to Chan. Plaintiff just made its speculation then allege Wang tipped Chan on Chan's trading.

From government's summary on Chan's purchase of Merrimack stock, Chan started trading Merrimack stock from August 8, 2013 and he continued his purchase over a spread-out time. As of April 21, 2014, he had already traded 327,749 shares of Merrimack stock out of his total 348,489 shares of Merrimack stock he ever purchased. Chan believed in Merrimack stock's potentials based on his long-time research. Chan predicted Merrimack would be a success. That is why he bought so many shares of Merrimack stock over the time.

Chan had already purchased about 90% of his entire Merrimack stocks over times prior to April 19, 2014 already. How those four phone calls on April 25, 2014, two phone calls on April 26, and six phone calls on April 27, 2014, how could Plaintiff tied those calls to tipping without providing any contents?

Plaintiff's complaint of paragraph:

*"28. Wang knew or was reckless in not knowing that the information he tipped to Chan was material and nonpublic, and that, by tipping Chan, Wang was breaching his duties to Merrimack and its shareholders."*

*"29. On May 1, 2014, prior to market open, Merrimack announced clinical study results indicating that patients treated with MM-398 showed improved pancreatic cancer survival rate as compared to the control protocol. That day, Merrimack shares closed at $6.99, which was 59 percent higher than the previous day's closing price."*

*"30. As a result of Chan's purchase of Merrimack stock between April 21 and April 28, 2014, he generated approximately $76,045 in profits as of the close of trading on May 1, 2014."*

Answer:

As described above, Plaintiff didn't provide any evidence for their complaint about the tipping activities. Their speculation was completely based on the timestamps of the record of phone calls. In paragraph 14 of this complaint, Plaintiff emphasized "Wang and Chen were close friends who regularly talked by phone". Plaintiff willfully forced tipping schema onto Chan's stock's purchases and forced the schema onto the purchases even before MNPI existed.

Again $76,045 is another place Plaintiff tries to make them misbelieve. Profit can only be realized when stocks are sold. On May 1, 2014, Merrimack stocks that Chan purchased on April 21 and April 28, 2014 were in paper format in which the stock value was not fixed. It fluctuated every day in the market. Plaintiff uses the stock price at the closing on May 1, 2014 to calculate out so called profit of $76,045 and transplanted this number onto Chan's head, but anybody with basic trading experiences know that $76,045 is a just number shown in calculator, it is an UNREALIZED gain. It is not the actual profit that Chan's purchases generated and took home.

If Chan still held those stock till today, he wouldn't get $76,045. Instead, it would be a negative gain or lost money—which is not an assumption, it is actually true. In Plaintiff's statements, it obviously shows that Plaintiff continually play tricks with this court by, first providing court speculation instead solid evidence, second willfully asserting tipping activity, lastly using an unrealized gain to state its assertion.

Plaintiff's complaint of paragraph:

*"31. Wang also tipped Chan about positive announcements on November 26, 2013 and December 13, 2013 regarding Merrimack's drug trial candidates. On November 26, 2013, Merrimack announced positive clinical study results for MM-121, a drug candidate for the*

*treatment of breast cancer. On December 13, 2013, Merrimack announced positive clinical study results for MM-302, another drug candidate for the treatment of breast cancer."*

*"32. Chan purchased shares of Merrimack stock based on tips from Wang in advance of both of these announcements."*

*"33. Wang disclosed confidential information about the MM-121 and MM-302 drug trials to Chan in breach of Wang's duties to Merrimack and its shareholders."*

*"34. In both those instances, Wang knew or was reckless in no knowing that the information he tipped to Chan was material and nonpublic, and that, by tipping Chan, Wang was breaching his duties to Merrimack and its shareholders."*

*"35. In total, Chan's illegal trading in Merrimack securities based on Wang's tips generated at least $245,203 in profits for Chan in 2013 and 2014."*

Answer:

During the testimony of Wang's criminal trial, it is confirmed that Wang was not involved in MM-121 and MM-302 drug trials at the time around November 26, 2013 and December 13, 2013. Trial Judge concluded that the government was unable to prove at trial that Wang ever possessed MNPI regarding MM-121 and MM-302(add. 40). Wang did not have any MNPIs at that time to tip Chan. Plaintiff clearly lies to this court by providing false information to achieve its own objectives. This is another example that Plaintiff plays the same tactics or tricks, 1) doesn't providing any facts of MNPI or providing false information of MNPI, 2) allege a tipping, 3)doesn't provide the accurate time period of MNPI, 4) then use unrealistic number(s) to reassert its allegation.


Plaintiff's complaint of paragraph:

*"36.   At all relevant times, Akebia was biopharmaceutical company that developed treatments for patients with kidney disease. In or around 2015, one of Akebia's leading drug candidates was Vadadustat, a potential treatment for anemia caused by chronic kidney disease."*

*"37.   On August 17, 2015, Chan joined Akebia as Director of Biostatistics."*

*"38.   As an employee of Akebia, Chan owed a duty of trust or confidence to Akebia and its shareholders. Chan also owed Akebia a duty to keep confidential material nonpublic information about Akebia's drug trials, as well as a duty to refrain from tipping this confidential information to others. On August 9, 2015, Chan signed a document acknowledging these duties. Chan also received a copy of Akebia's Insider Trading Policy, as well as an August 14, 2015 email from the company's General Counsel directing employees to not communicate publicly about Akebia and to refrain from discussing the upcoming Akebia Announcement with anyone outside Akebia."*

*"39.    On or before August 19, 2015 and continuing through the week of August 24, 2015, Chan participated in several internal Akebia meetings and conversations in which he gained access to material nonpublic information about positive drug trial results for Vadadustat, which was Akebia's then-leading drug candidate."*

Answer:

There were two clinical drug trials of Akebia's leading drug candidate, Vadadustat, in or around 2015. One is a phase 2b clinical trial in non-dialysis patients. Another is a phase 2b clinical trial in dialysis patients. The results of Phase 2b clinical trial in non-dialysis patients was announced on March 16, 2015: Data Achieved Clinically Important Safety and Efficacy Goals. Phase 2b clinical trial in dialysis patients was still going on in August 2015. In August 11, 2015, Akebia announced its Second Quarter 2015 Financial Results. In this announcement, John P. Butler, President and Chief Executive Officer of Akebia, said "we presented new data highlighting the best-in-class potential of Vadadustat..." "We look forward to advancing Vadadustat into a Phase 3 program later this year once we have successfully completed our discussions with the United States Food and Drug Administration and the European Medicines Agency. We remain on track to report top-line results from out Phase 2 study of Vadadustat in dialysis patient in the third quarter." In corporate highlights, it stated 'Raised approximately $65 million" "Entered into a Master Services Agreement with Quintiles, Inc., a contract research organization, in connection with Akebia's planned Phase 3 clinical studies of Vadadustat". In above statements, it shows Akebia was highly confident with its drug candidate of Vadadustat and would invest more money and resources to start a phase 3 clinical trials.

As a newly employed worker, he got trained and knew the insider trading policy. Most important item of the policy is, don't trade when you possess MNPI.

Plaintiff's complaint of paragraph:

*"40.   In Breach of his duties to Akebia and its shareholders, Chan intentionally or recklessly tipped material nonpublic information about the Vadadustat drug trial results to Wang."*

*"41.    On Monday, August 24, 2015, Chan had at least five telephone calls with Wang, including two calls of over three minutes each. Chan also texted Wang that afternoon. Over the next three days, Chan and Wang had at least ten phone calls and exchanged at least eleven text messages. On Friday, August 28, 2015, after receiving two calls from Chan earlier in the day, Wang purchased 20 Akebia call options and 3,000 shares of Akebia stock. Later that day, after receiving a text message from Chan, Wang also sold 20 Akebia put options."*

*"42.    Wang made additional purchases of Akebia stock the next week. On Monday, August 31, 2015, Wang purchased an additional 12,475 Akebia shares. On September 1, 2015, Wang purchased an additional 5,000 Akebia shares. On September 3, 2015, Chan and Wang spoke by telephone and exchanged text messages. The next day, September 4, 2015, Wang purchased an additional 2,965 Akebia shares."*

*"43.  Overall, between August 28 and September 4, 2015, Wang purchased 23,440 Akebia shares and 20 Akebia call options and sold 20 Akebia put options."*

*"44.  Wang made his purchases and sales of Akebia securities between August 28 and September 4, 2015, while aware of, and on the basis of, material nonpublic information about the Vadadustat drug trial results that he had received from Chan."*

Answer:

Plaintiff still use the same tricks on Wang's purchases of Akebia stock as to Chan's purchase of Merrimack stock. It mentioned that Chan intentionally or recklessly tipped MNPI to Wang through phone calls and text messages. But Plaintiff never gave any details or facts of the contents of those calls and messages. Plaintiff recklessly slander Chan tipped Wang in tens of times of phone calls, tens of times of text messages.  However, during the exhibits of evidence in Wang's criminal trial, government showed they have the capability to produce and have already produced a chart of text mail conversation between Wang and Chan. Can Plaintiff pick one text message from the record they possessed to prove Chan tipped Wang, and after that Wang purchased Akebia stock? Plaintiff has not presented any solid evidence to confirm Wang got the MNPI from Chan and used the MNPI to trade Akebia stock. Because most of those messages are with some contents like, where are you? Have time to eat? Meet in a restaurant? etc.  None of those messages is MNPI or related to MNPI or related to tipping.

As mentioned in answer to paragraph 40 through 44, Akebia was so confident on its phase 2b trials and decided to invest more money to conduct phase 3 trials. If phase 2 trials weren't successful, how could a phase 3 trial be invested? In Akebia's Second Quarter 2015 Financial Results, Akebia already has forward looking statements and had hinted the public the upcoming phase 2 clinical trial should have good results.

On August 13, 2015, Yahoo Finance published an article stated "Why Akebia Therapeutics Is Worth $10 Per Share". At that time, Akebia's stock price was around $7.

Based on that public information and Akebia released "on track to report top line results… in the third quarter.", Wang started to buy Akebia stock on August 28, 2015 when Akebia's stock price started moving-up. If followed Plaintiff's fabricated tipping schedule which started from August 24, 2015, Wang wouldn't have sold 20 RLYP put contracts, wouldn't have bought 20 GILD call contracts, wouldn't have sold 10 CEMP put contracts on August 26, 2015; Wang wouldn't have sold 20 VIPS put contracts, would not have bought 500 shares VIPS stock, would not have bought 3000 shares MACK stock, would not have bought 500 shares CEMP stock, would not have bought 20 ASHR calls on August 27, 2015; Wang should use those funds to buy Akebia's call options which could gain more profits. Wang was not 100% sure the upcoming phase 2 trial was a definite success. That is why he only purchased 20 call contracts, sold

20 put contracts, and 3000 shares of Akebia's stock on August 28, 2015. If Wang gained the MNPI from Chan, then Wang would have played 'All-in' to spend all of those money, started from August 24 other than August 28, 2015, to only buy call options of Akebia to leverage and get the maximum profits,.

Plaintiff's complaint of paragraph:

*"45. Chan knew or was reckless in not knowing that the information he tipped to Wang was material and nonpublic, and that, by tipping Wang, Chan was breaching his duties to Akebia and its shareholders."*

*"46. Wang made his trades in Akebia securities between August 28 and September 4, 2015, alleged above, based on Chan's tips even though Wang knew or was reckless in not knowing, or consciously avoided knowing that Chan's disclosure of the information to him was improper and violated Chan's duties to Akebia and its shareholders."*

Answer:

Plaintiff repeatedly lied or misled this court by recklessly fabricating the tipping scenario. It alleged Chan tipped Wang in many many occasions but don't provide any contents to support them. Wang didn't possess any MNPI when traded stocks. But Plaintiff accuses Wang "reckless in not knowing, or consciously avoided knowing that Chan's disclosure of the information to him" anyway.

Plaintiff's complaint of paragraph:

*"47. After the market close on September 8, 2015, Akebia announced positive drug trial results, stating that Vadadustat "demonstrated a favorable safety profile with no drug-related serious adverse events and no deaths." On September 9, 2015, the day after the Akebia Announcement, Akebia's stock closed at $11.36, which represented an increase of approximately 45 percent over the pre-Akebia Announcement closing price."*

*"48. As a result of the post-Akebia Announcement increase in Akebia's stock price, the value of Wang's Akebia shares and call options increased by approximately $105,811, and Wang also realized a profit of approximately $2,200 on his pre-Akebia Announcement sale of Akebia put options, when those options expired worthless."*

Answer:

As Wang expected from his research, Akebia announced a positive drug trial results on September 8, 2015. Akebia's stock increased approximately 45 percent. The value of Wang's portfolio was increased. His research was rewarded.

Plaintiff's complaint of paragraph:

*"49. In February 2017, Wang was arrested by the FBI and charged with insider trading in Akebia and Merrimack securities and conspiracy to commit securities fraud. Chan was arrested by the FBI several months early, in June 2016, and also charged with insider trading in Akebia and Merrimack securities and conspiracy to commit securities fraud."*

*"50. On July 10, 2018 Wang and Chan were convicted of all charges in the Criminal Case."*

*"51. Wang's securities fraud conviction in the Criminal Case reflected his trading in Akebia securities base on Chan's tips in advance of the Akebia Announcement and his tipping of Chan to trade in Merrimack securities."*

Answer:

Answer:

In the Criminal Case, Wang and Chan were convicted in security fraud and conspiracy to commit security fraud. Jury didn't perform its due diligence to review the evidences and court argument. In just about half hour after the ending session of the jury trial, Jury made its verdict. During the jury trial, lots of statements from testimony and evidence demonstrate that prosecutors did not prove beyond a reasonable doubt of each and every element of the crime. Prosecutor provided untrue "facts" and inaccurate "evidences". When prosecutor noticed their mistakes, it exaggerated evidences to cover themselves up. "in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt" (U.S. v. Newman, No. 13-1837, 2nd Cir. 2014). Judge Talwani admitted there are variances in the criminal case. Based on rule 29, the criminal case deserves an acquittal. The case is currently under appeal.

Overall, Plaintiff recklessly alleged Wang without any supporting facts. Plaintiff fabricates facts, imitates facts, and/or uses false information to maliciously complain Wang on this civil case.

**WHEREFORE,** this Answering Defendant prays that this Honorable Court will dismiss the Complaint with prejudice.

DATED: __21__ day of February 2020

Defendant Pro Se

4 Deer Run Dr, Page 14 of 14
Westford, MA 01886